IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 2, 2016

## STATE OF TENNESSEE v. LARRY MICHAEL BERKLEY

**Appeal from the Circuit Court for Lauderdale County**
**No. 9714     Joe H. Walker, III , Judge**

---

**No. W2015-00831-CCA-R3-CD  -  Filed May 17, 2016**

---

The Defendant-Appellant, Larry Michael Berkley, was convicted by a Lauderdale County jury of two counts of rape, four counts of aggravated statutory rape, four counts of sexual battery by an authority figure, and four counts of statutory rape by an authority figure. On appeal, Berkley[1] argues that (1) the evidence was insufficient to support his convictions; (2) the trial court erred in admitting cumulative and unduly prejudicial testimony; and (3) the trial court erred in allowing a witness to testify about a news report regarding Berkley in violation of Rule 404(b) of the Tennessee Rules of Evidence. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and TIMOTHY L. EASTER, JJ., joined.

Bryan Russell Huffman, Covington, Tennessee, for the Defendant-Appellant, Larry Michael Berkley.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zenter, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Julie K. Pillow, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

On June 2, 2014, the Lauderdale County Grand Jury returned a fourteen-count indictment against Berkley, charging him with two counts of rape, four counts of

---

[1] We acknowledge that we do not use titles when referring to every witness. We intend no disrespect in doing so. Judge John Everett Williams believes that referring to witnesses without proper titles is disrespectful even though none is intended. He would prefer that every adult witness be referred to as Mr. or Mrs. or by his or her proper title.

aggravated statutory rape, four counts of sexual battery by an authority figure, and four counts of statutory rape by an authority figure. The offenses were alleged to have been committed against three minor victims, J.H., M.C., and C.E.[2]

At trial, C.E. testified that he met Berkley through a mutual friend, B.B.,[3] in 2010 when he was seventeen years old. C.E. attended Victory Baptist Church with B.B. on April 18, 2010, and he testified that he remembered the date specifically because it was his older brother's birthday. After the service, he and B.B. accompanied Berkley back to Berkley's house at the time, a Victorian-style house located on Durhamville Road in Lauderdale County, Tennessee. C.E. testified that when they got in the car, Berkley stated that he "couldn't wait to get home to get some drink and some ass," and C.E. stated that the comment made him think that "there were females at the home when we were getting there." Upon arrival, all three proceeded to the den, and Berkley asked C.E., "what do you drink," to which C.E. responded, "water, coke, or sweet tea." Berkley then specified that he was referring to alcoholic beverages, at which point C.E. stated, "well, vodka." A few minutes later, Berkley brought him a clear drink, which C.E. stated "tasted fruity, and [] had a fruity scent, kind of a sweetish smell." C.E. testified that he started feeling "funny" not long after he began drinking the drink and that he went to the back porch to smoke a cigarette and regain his composure.

A short time later, B.B. appeared and stated that the two of them would have to go upstairs. C.E. asked why, and B.B. replied "well you just know," to which C.E. stated "no, I really don't." Berkley then appeared, wearing only underwear, and told B.B., "come on, come inside." At this point, C.E. testified that he told B.B. that he had to go home, before B.B. implored him to come back inside and "come upstairs and lay down."

Believing that he was going to go inside and sleep off his inebriation, C.E. allowed B.B. to assist him up the stairs of the house, stopping several times because C.E. felt like he was going to pass out. B.B. placed C.E. on the bed in Berkley's room, and C.E. recalled that Berkley was on the opposite side of the bed. C.E. testified that he then crawled into the bathroom, and when he attempted to return to the bedroom, he saw Berkley and B.B. "having sex on the bed." C.E. testified that he attempted to leave but "kept passing out," before he awoke on the bed with B.B. and Berkley, who were removing his clothes. C.E. subsequently passed out again, and awoke to Berkley "licking on [his] scrotum" and penis before passing out again. When he awoke the next time, Berkley inserted his finger into C.E.'s anus, causing C.E. to jerk away and roll over onto

---

[2] In an effort to protect the anonymity of the minor victims, this court refers to them by initials only.

[3] Though not a victim in this case, because of the content of C.E.'s testimony, we have chosen to refer to B.B. by his initials only.

his back. C.E. recalled that he told Berkley to stop, but that Berkley "didn't even acknowledge it." C.E. testified that he was unable to fully resist because of his inebriation, and that during the entire episode, he was only able to remain awake for a few seconds before passing out again. Finally, C.E. testified that he awoke to Berkley and B.B. putting his clothes back on, and Berkley gave him some water and crackers to help C.E. "sober up a little." Berkley then drove C.E. home, instructing him not to tell anyone what had happened. When he arrived at home, C.E. told his mother he was feeling sick and went to bed. C.E. testified that he didn't tell anyone about the incident sooner because he was scared of Berkley and B.B.

B.B. also testified at trial that he would have been "[r]oughly" fifteen or sixteen in April of 2010. He testified that he and C.E. had once been friends but that he had no recollection of being at Berkley's house with C.E. on April 18, 2010. He denied ever having a sexual encounter with Berkley, seeing Berkley have a sexual encounter with C.E., or seeing Berkley give alcohol to C.E. He also stated that during their relationship, Berkley never discussed the subject of sexuality with him. B.B. estimated that he spent the night at Berkley's house on Durhamville Road between twenty and forty times and that he slept in the same bed as Berkley "[t]wo or three times, because he didn't have a bed at that time in the guest bedroom." He testified that he did not recall ever drinking alcohol with Berkley but that Berkley would allow him to smoke when he was at his house.

The second victim, M.C., testified that he met Berkley in the spring of 2011, when he was fifteen years old. One night during that spring, he received a text message from Berkley between 11:00 p.m. and 12:00 a.m. asking him to come to the church. Because he lived a short distance away, M.C. agreed and walked over, meeting Berkley in his office. Upon arriving, M.C. testified that Berkley began "describ[ing] pleasure," and homosexuality, leading M.C. to believe that Berkley was making a pass at him. M.C. testified that he then asked Berkley, "how much would you pay for me" to which Berkley responded "at least [five hundred dollars]." M.C. testified that there was a "green striped couch," in a nearby room and the two then had both oral and anal sex on the couch. When they were done, Berkley paid M.C. five hundred dollars in cash from a black leather wallet, and M.C. left. M.C. told his parents that he had been betting on sports games to explain the money, and he testified that he and Berkley began to use the term "betting" as a code for sex.

M.C. testified that Berkley paid him for sex on two other occasions in the spring of 2011. He testified that the second encounter also occurred at the church, and he was paid three hundred dollars for giving Berkley oral sex. For the third encounter, M.C. testified that Berkley picked him up from his home and drove him to Berkley's house on Durhamville Road. M.C. claimed that during this encounter, he engaged in oral sex with

Berkley and was paid one hundred dollars. At the time of the trial, M.C. testified that he was married and had one child. He claimed that the first person he told about his sexual encounters with Berkley was the detective investigating the case. He stated that he did not come forward earlier because he was embarrassed, ashamed, and afraid to face his father. M.C. also testified that Berkley told him he had a sleeping disorder that was so severe, he once had sex with a woman while asleep without knowing it.

On cross-examination, M.C. admitted that he was intoxicated during the first and third encounters with Berkley. M.C. clarified that on each occasion he was paid in one-hundred-dollar bills from a black leather wallet. When asked to describe the room in Berkley's house where the third encounter took place, he stated that the walls were beige but was unable to describe the color of the carpet. M.C. also testified that he did not recall ever being asked to leave the church but that he voluntarily stopped attending after the first encounter with Berkley.

The final victim, J.H., testified that he was abused by Berkley when he was thirteen, while staying with him while his parents were on a cruise. He testified that he was staying with his grandmother while his parents were away, but planned to stay with Berkley on the night of February 25, 2012, after helping him with some renovation work on his new house on Poplar Grove Cemetery Road. He testified that Berkley picked him up at his grandmother's house, and while they were in the car stated, "I'm going to tell you some rules about what goes on at my house . . . what happens at my house, stays at my house." Berkley continued to tell J.H. that he and another individual who occasionally stayed with him, "liked to walk around the house naked," and told J.H. to just ignore it. He also told J.H. that "people come over to [the] house sometimes and they use inappropriate and vulgar language."

When they arrived at Berkley's house, a third individual from the church came over to help, and they worked until the other individual left at about 10:00 p.m. At this point, J.H. testified that Berkley shut and locked the door, and announced that it was time for bed. Berkley told J.H. that he would have to sleep with him since there was no other bed in the house. Before going to sleep, Berkley told J.H. about a sleeping disorder that he had, which had caused him to "ha[ve] sex with a girl one time while he was asleep and he didn't even know it." J.H. testified that between 1:00 and 2:00 a.m., he woke up and Berkley was "down on my penis." He testified that he had gone to bed with shorts on, but when he woke up, the shorts were gone and Berkley was performing oral sex on him. J.H. testified that he then "hit [Berkley] in the head and pushed him off," at which point Berkley rolled back over and went to sleep.

J.H. testified that Berkley woke him, still naked, to get ready for church between seven and eight the following morning. J.H. testified that the bathroom had no door on it,

a clear shower curtain, and "a mirror in front of the shower so you could see everything." He stated that when he got in the shower, Berkley came back in "to brush his teeth and shave and all that stuff," and showered while using a rag to cover his genitals. When he got out, Berkley asked J.H., "did I do anything weird last night," and J.H. told him that he did not, "[b]ecause I didn't know if he was like going to be mad or what he would do."

J.H. testified that he was reprimanded the following week at school for having his cell phone out. When confronted by his grandmother about the incident, J.H. testified that he "lashed out on her, like I wanted to fight her." He testified that this was very unusual for him and that he had never lost his temper on his grandmother like that in the past. When asked if he felt bad about how he had lashed out, J.H. responded, "Yes ma'am, because I told both [grandparents] that I hated them. Like, that made me feel worse than what I already was [feeling]. Because I told them I hated them, I wanted them out of my life, and that was not what I do. I don't do that."

J.H. testified that he did not report the incident until approximately two years later when Berkley was arrested and someone told him there was a report on the news about Berkley. After the report came out, J.H.'s mother asked him if Berkley had ever done anything to him, and J.H. confessed to her what had transpired when he had stayed with Berkley. On cross-examination, J.H. admitted that he did not report the incident to any of his teachers at school, anyone else at the church, or his parents initially because his father, "probably wouldn't have took [sic] it well at all."

J.H.'s grandmother, P.N., testified at trial and confirmed the incident regarding J.H.'s cell phone and that J.H. had lashed out against her in a manner that was unusual for him. "He got really angry and got up in my face, and I had to hold him down until he quit struggling[.]" She additionally confirmed the dates that J.H. had stayed with Berkley, and the timing of when he reported the incident.

J.H.'s step-mother, C.H., testified that she and her husband went on a cruise during the weekend of February 25, 2012, and that during that time, J.H. had permission to stay with Berkley. She testified that she had no problem with J.H. spending the night with Berkley because, as her pastor, she trusted him. "I [saw] no problem with it. Like I said, I trusted this man, loved this man. He was a friend of our family. He was our pastor . . . I had no reason not to allow my son to go help this man." On cross-examination, she admitted that J.H. never indicated that Berkley had abused him until May of 2014, when reports of Berkley's arrest were on the news.

Brian Boothe testified that he was an elder and deacon at Victory Baptist Church during the time Berkley was the church's pastor. He testified that initially, Berkley was living in a house in Durhamville, Tennessee, but that because of plumbing and other

issues with the house, the church purchased a house for him on Poplar Grove Cemetery Road. He stated that Berkley moved into the home in November of 2011. Boothe also testified that while Berkley was the pastor, members of the church became concerned that he was focusing too much on the youth. Boothe recalled that on one occasion, he had a conversation with Berkley to remind him, "[t]hat he was our pastor, not the youth pastor, and that he needed to focus his attention more on adults." Boothe testified that even after this conversation, he "didn't really see any change. There was still a lot of activity with the youth."

Boothe testified that Berkley was asked to resign as pastor of the church in March of 2012, and a signed letter of resignation was entered into evidence. Boothe claimed that the resignation was not related to allegations of abuse against Berkley, and that he did not become aware of those allegations until after Berkley had left the church. On cross-examination, Boothe admitted that it was not out of the ordinary for a pastor to attend youth functions, and that Berkley also attended several adult events while he was the pastor at Victory Baptist.

Robert Ward testified that Berkley was the pastor at Victory Baptist Church when he began attending in 2010. He testified that when he first started attending the church, Berkley lived "somewhere in Durhamville," but that because of problems with that house, the church arranged to purchase a home for Berkley on Poplar Grove Cemetery Road in September of 2011. Ward helped Berkley and J.H. make repairs on Berkley's home on Poplar Grove Cemetery Road during the weekend of February 25, 2012. He further testified that Berkley seemed to take a special interest in the youth of the church.

Karen Berkley, the Defendant-Appellant's sister, testified that she attended Victory Baptist Church during the time her brother was the pastor. She recalled that while Berkley was staying in the Durhamville house, his bedroom walls were painted a distinct shade of pink and the carpet was also a different shade of pink. She also recalled that Berkley used a distinct leopard-printed shower curtain. She testified that she was aware that J.H. had gone to Berkley's house to help make repairs, but did not specify when. She also stated that she was not at Berkley's house on February 25, 2012, and did not know if the leopard-printed shower curtain was up that day.

Karen Berkley also testified that she knew M.C. through the church, and that he was asked to leave a Halloween event the church was hosting on two separate occasions. She stated that on the first occasion, M.C. showed up to a bonfire wearing a mask and "wielding a machete." The following year, her brother asked M.C. to leave a church hayride after he showed up wearing a clown mask and refused to take it off. Ms. Berkley was also aware that B.B. had stayed overnight at her brother's home on multiple occasions, but was not aware if J.H. or M.C. had.

-6-

Berkley testified that he was born on July 13, 1979, and began preaching at Victory Baptist Church in the spring of 2009. He confirmed that J.H. stayed at his house during the weekend of February 25, 2012, but denied the allegations by J.H. and claimed that on February 25, 2012, he, J.H., and another member of the church worked until about 10:00 p.m., at which point he went to bed, and J.H. fell asleep on the couch watching a movie.

Regarding M.C., Berkley testified that "there were always problems with [M.C.] at the church from the time we got there." He confirmed that he had asked M.C. to leave two Halloween functions at the church. Berkley admitted to texting M.C. to come meet him at the church, but claimed it was at the request of his mother, in an attempt to get him more involved with the church. He denied texting M.C. to arrange sexual encounters and denied that he had any sexual contact with M.C. or paid M.C. for sex. Berkley additionally denied carrying a wallet as described by M.C., claiming that he had only used a money clip since "2004 or 2005."

When asked about the allegations made by C.E., Berkley testified that he "vaguely remember[ed]" that C.E. and B.B. had come to his house in Durhamville one day after church. He denied giving C.E. alcohol and denied keeping alcohol in his house. He denied any form of sexual contact with either B.B. or C.E. He testified that the day C.E. came to his house with B.B. was the first time he had met C.E. and that it was "absurd" that he "would try to take advantage of somebody, you know, the first weekend I ever meet this person." When questioned about his resignation from Victory Baptist, Berkley admitted that he signed the letter of resignation on March 29, 2012, which reflected that he was resigning because he had "done some things that are unbecoming of a pastor and that could be detrimental to Victory Baptist Church."

Based on the entirety of the proof, the jury convicted Berkley on all counts. Berkley was convicted of the rape of C.E. and J.H., as well as three counts of statutory rape by an authority figure against M.C. He received a sentence of ten years on each rape conviction and five years for each offense committed against M.C. Each sentence was ordered to be served consecutively for a total effective sentence of thirty-five years. Berkley filed a timely motion for new trial and a motion for judgment of acquittal, both of which were denied in an order issued by the court on April 16, 2015. It is from this order that Berkley appeals.

## ANALYSIS

**I. Sufficiency of the Evidence.** Berkley contends that the evidence was insufficient to support his convictions because the victims' testimony was not credible. Specifically, he argues that (1) the testimony of C.E. was completely rebutted by the

testimony of B.B.; (2) M.C. did not recall key details of the scene where he alleged the offenses took place; and (3) M.C. testified that he was abused at the Poplar Grove Cemetery Road house during a period of time when Berkley did not have access to that house. The State contends that any doubts regarding credibility or discrepancies in the proof were for the jury to resolve, and that the evidence was sufficient to support the convictions in all respects. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt."

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not substitute its inferences for those drawn by the trier of fact. Id.

**A.  Sufficiency of the Evidence for Rape of C.E. and J.H.**  To sustain a conviction for rape as charged in this case, the State was required to prove beyond a

reasonable doubt the unlawful penetration of the victim by the defendant, or of the defendant by the victim, if the defendant knew or had reason to know that the victim did not consent to the penetration, or if the penetration was accomplished through the use of force or coercion. T.C.A. § 39-13-503. Sexual penetration is defined in relevant part as "fellatio . . . or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's[.]" Id. § 39-13-501(7). Viewed in the light most favorable to the State, the evidence showed that C.E. visited Berkley at his house on April 18, 2010. Upon his arrival, C.E. was given alcohol and shortly thereafter, began feeling impaired. C.E. was asked to come upstairs by Berkley and B.B. and went along, believing he would be allowed to sleep off his impairment before going home. Instead, he was placed on Berkley's bed, at which point Berkley penetrated his anus with his finger. C.E. did not consent to this penetration.

The fact that C.E.'s testimony was refuted by B.B. does not preclude Berkley's rape conviction. The Tennessee Supreme Court has held that "it has long been the rule in our state that the uncorroborated testimony of a minor victim may be sufficient to sustain a conviction for forcible or coercive sex offenses such as simple rape." State v. Collier, 411 S.W.3d 886, 899 (Tenn. 2013). Moreover, as the trier of fact, the jury must evaluate the credibility of the witnesses, determine the weight given to the witnesses' testimony, and reconcile all conflicts in the evidence. Campbell, 245 S.W.3d at 335. In returning a verdict of guilty, the jury credited the testimony of C.E. over the testimony of B.B. and Berkley, as was their prerogative. Accordingly, Berkley is not entitled to relief on this issue.

Berkley does not challenge any element supporting his conviction for the rape of J.H. Nevertheless, we have reviewed the record and determined that, taken in the light most favorable to the State, the evidence is sufficient to support this conviction as well. J.H. testified that he was thirteen years old when he stayed at Berkley's house in February of 2012. After falling asleep in Berkley's bed, he awoke between one and two in the morning to Berkley fellating him. The following morning, Berkley asked J.H. if he had done "anything weird last night," and J.H. said he had not out of fear of Berkley's reaction. This evidence, accredited by the jury, provides a sufficient basis to convict Berkley of the rape of J.H. Berkley is not entitled to relief on this issue.

**B. Sufficiency of the Evidence for Offenses Committed Against M.C.** Berkley contends that the evidence was insufficient to support his convictions for statutory rape by an authority figure, aggravated statutory rape, and sexual battery by an authority figure against M.C. In support, he argues that "there was no corroborating physical evidence and [M.C.'s] testimony is suspect," because, he claims, M.C. could not recall "key details" about the alleged offense and because Berkley did not have access to the location where M.C. alleged the abuse to have occurred.

Tennessee Code Annotated section 39-13-532(a) defines the crime of statutory rape by an authority figure, a Class C felony, as the unlawful sexual penetration of a victim by the defendant where the victim is between the ages of thirteen and eighteen, the defendant is at least four years older than the victim, and the defendant used a position of trust or power to accomplish the sexual penetration. See T.C.A. § 39-13-532(a)-(b). Sexual battery by an authority figure, a Class C felony, is defined by Tennessee Code Annotated section 39-13-527. As relevant here, it is the unlawful sexual contact with a victim between the ages of thirteen and eighteen by a defendant who was, at the time of the offense, in a position of trust with the victim, and used that position of trust to accomplish the sexual contact. Id. § 39-13-527(a). "Sexual contact" includes the intentional touching of the victim's intimate parts if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification. Id. § 39-13-501(6). Additionally, "intimate parts" include, inter alia, the genital area, groin inner thigh, buttock or breast. Id. § 39-13-501(2).

Aggravated statutory rape, a Class D felony, is defined by Tennessee Code Annotated section 39-13-506(c). As relevant to this case, it requires the State to prove beyond a reasonable doubt the unlawful sexual penetration of a victim that is between the ages of fifteen and eighteen where the defendant is at least ten years older than the victim.

In our view, Berkley grossly mischaracterizes M.C.'s testimony in the record on appeal. In support of his contention that M.C.'s testimony was "suspect" he claims that M.C. "could not recall the type of wallet carried by [Berkley] from which he allegedly paid [M.C.] for sexual relations." Berkley also claims that M.C. testified that "two of the offenses occurred at the residence located at 1857 Poplar Grove Cemetery [Road]" between January 2011 and June 2011. Neither of these contentions is supported by the record. Regarding the wallet, defense counsel cross examined M.C. on the issue as follows:

Q: Okay. And you said he paid you out of a wallet. Can you describe this wallet?

A: Black leather wallet.

Q: And how many – you said $500. How did he pay you? Was it cash?

A: Hundred-dollar bills.

Q: Five one-hundred-dollar-bills out of a black leather wallet?

-10-

A: Yes.

Later, defense counsel cross-examined M.C. again on this point:

Q: And again, describe the wallet for me.

A: Black leather wallet.

Q: Anything special about this, or just a black leather wallet?

A: Black leather wallet.

Additionally, M.C. never claimed that he was abused by Berkley at the house on Poplar Grove Cemetery Road. M.C. testified consistently that the first two encounters with Berkley occurred in the spring of 2011 at Victory Baptist Church, and the third encounter occurred, also that spring, occurred at Berkley's house in Durhamville.

Viewed in the light most favorable to the State, the evidence was sufficient to support Berkley's convictions. The proof shows that Berkley engaged unlawful sexual contact with M.C. on three separate occasions when M.C. was fifteen years old and Berkley was thirty-one. The first incident occurred at the church and when M.C. engaged in oral and anal sex with Berkley in exchange for five hundred dollars. On the second occasion, M.C. engaged in oral sex with Berkley at the church and was paid three hundred dollars. On the third occasion, M.C. was paid one hundred dollars for engaging in oral sex with Berkley at his home in Durhamville, Tennessee. A jury could have reasonably concluded that the purpose of these encounters was Berkley's sexual gratification because Berkley paid M.C. after each occasion. See Hall v. State, 490 S.W.2d 495, 496 (Tenn. 1973) (holding that a jury may infer intent from circumstantial evidence); State v. Meeks, 876 S.W.2d 121, 131 (Tenn. Crim. App. 1993) (holding that a jury may draw on common knowledge and reasonably infer that the defendant grabbed the victim's breast for the purpose of sexual gratification). Finally, Berkley was the pastor at the church M.C. attended and used the church facilities for at least two of the sexual encounters with M.C. Under these facts, a jury could reasonably determine that Berkley used a position of power or trust to accomplish the unlawful sexual contact with M.C. Berkley is not entitled to relief on this issue.

**II. Testimony of P.N.** Berkley also contends that the trial court committed reversible error by allowing the testimony of P.N., J.H's grandmother. In support, he argues that P.N.'s testimony was cumulative, irrelevant and unfairly prejudicial. The State responds that the evidence was relevant for the purpose of corroborating J.H.'s

testimony and that the trial court was well within its discretion in allowing the testimony. We agree with the State.

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court is found to have abused its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Lewis, 235 S.W.3d at 141 (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)).

Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not determined to be relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined by the Tennessee Supreme Court as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403 advisory committee's notes). "Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror." State v. Young, 196 S.W.3d 85, 106 (Tenn. 2006) (citations and internal quotation marks omitted). Whether evidence is relevant is a decision left to the discretion of the trial court, and this court will not will not overturn a trial court's determination regarding relevancy without a showing that the trial court abused its discretion. State v. Brown, 373 S.W.3d 565, 573 (Tenn. Crim. App. 2011) (citing State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995)).

This issue was not raised in Berkley's motion for a new trial, and the trial court did not address it in its order denying the motion. Consequently, the issue is waived. Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Berkley also fails to provide argument in support of this issue other than asserting that the evidence was cumulative and served to inflame the jury. In any event, our review of the record shows that P.N.'s testimony was relevant to show that J.H. was behaving unusually in the days immediately following the alleged abuse. Moreover, this court has routinely

-12-

permitted testimony from relatives regarding unusual changes in a child's behavior following instances of abuse because such evidence assists the jury in evaluating the credibility of the victim and is therefore relevant. See e.g., State v. Richard Thomas Kelley, No. M2014-0740-CCA-R3-CD, 2015 WL 1777547, at *2 (Tenn. Crim. App. April 16, 2015), perm. app. denied (Tenn. June 11, 2015) (victim's mother testifying that victim's behavior "changed since the abuse and that she was getting into trouble at school and seemed angry"); State v. Jaleel Jovan Stovall, No. W2013-02553-CCA-R3-CD, 2014 WL 6482827, at *2 (Tenn. Crim. App. Nov. 18, 2014) (victim's mother testifying that victim began to cut herself and bathe excessively following abuse); State v. William Franklin Chumley, No. W2011-01832-CCA-R3-CD, 2012 WL 3134033, at *1-2 (Tenn. Crim. App. Aug. 1, 2012) (victim's mother testifying that victim had nightmares, became angry, and had trouble in school following abuse); State v. Glyn Dale, No. E2008-01139-CCA-R3-CD, 2010 WL 1241601, at *1-2 (Tenn. Crim. App. Mar. 31, 2010), perm. app. denied (Tenn. Aug. 25, 2010) (victim's mother testifying that victim became "hard to deal with" as well as school principal's testimony that the victim became "short-tempered and withdrawn," following sexual abuse); State v. James Vanover, No. E2005-01192-CCA-R3-CD, 2006 WL 521496, at *1 (Tenn. Crim. App. Mar. 2, 2006) (victim's aunt testifying that she noticed a change in the victim's behavior following abuse); State v. Steven Paul Deskins, No. M2002-01808-CCA-R3-CD, 2003 WL 21957083, at *2 (Tenn. Crim. App. Aug. 14, 2003), perm. app. denied (Tenn. Jan. 5, 2004) (victim's mother testifying that victim "had significant behavioral problems" during the period of time she was being abused). Berkley is not entitled to relief on this issue.

**III. 404(b) Evidence.** Prior to J.H.'s testimony, the trial court held a jury-out hearing to determine whether J.H. would be allowed to testify that he reported the abuse to his mother after learning that a news report aired reporting Berkley's arrest. The court allowed J.H. to testify that the news report was a "triggering event" which prompted him to report his allegations against Berkley, but did not allow him to testify as to the content of the news report. At the conclusion of the testimony, the trial court instructed the jury that they were not to consider any testimony as evidence that Berkley had a propensity to commit a particular kind of crime.

Berkley contends that the trial court committed reversible error by allowing J.H. to testify that he was prompted to come forward after hearing about the news report. In support, he argues that "the jury was exposed to 404(b) prohibited testimony which further prejudiced [Berkley] on all charges." The State responds that the trial court properly limited the testimony to explain what precipitated J.H.'s decision to report the abuse. We agree with the State.

Evidence of a defendant's character offered for the purpose of proving that he or she acted in conformity with that character is inadmissible. See Tenn. R. Evid. 404(a).

-13-

However, evidence of other crimes, wrongs, or bad acts may be admissible for other purposes if this evidence satisfies the conditions in Rule 404(b). Rule 404(b) states:

> **Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Pursuant to the Advisory Commission Comment to Rule 404, "evidence of other crimes should usually be excluded." Tenn. R. Evid 404(b), Adv. Comm'n Cmt. However, in exceptional cases, "where another crime is arguably relevant to an issue other than the accused's character," such as "identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake," the evidence may be admissible. Id.; see also State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004) (stating that evidence of other crimes, wrongs, or acts may be admissible if it establishes the defendant's motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation).

Additionally, contextual background evidence containing proof of other crimes, wrongs or acts may also be offered as an "other purpose" under Rule 404(b) "when exclusion of that evidence would create a chronological or conceptual void in the presentation and that void would likely result in jury confusion concerning a material issue or the evidence in the case." State v. Gilliland, 22 S.W.3d 266, 272 (Tenn. 2000); see also State v. Little, 402 S.W.3d 202, 210 (Tenn. 2013) ("Moreover, this Court has expanded the list of exceptions to include a limited amount of other crimes evidence

when necessary to provide a 'contextual background.'"). In <u>Gilliland</u>, the Tennessee Supreme Court set forth the following test for the admissibility of evidence of other crimes, wrongs, or acts that is relevant only to provide contextual background:

> [W]hen the state seeks to offer evidence of other crimes, wrongs, or acts that is relevant only to provide a contextual background for the case, the state must establish, and the trial court must find, that (1) the absence of the evidence would create a chronological or conceptual void in the state's presentation of its case; (2) the void created by the absence of evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice.

<u>Gilliland</u>, 22 S.W.3d at 272. This test is specifically restricted to "evidence of other crimes, wrongs, or acts that is relevant <u>only</u> to provide a contextual background for the case." <u>Id.</u> (emphasis added); <u>see</u> <u>State v. Leach</u>, 148 S.W.3d 42, 58 (Tenn. 2004).

If a trial court does not substantially comply with the procedural requirements of Rule 404(b), then this court will review the trial court's admissibility ruling de novo. <u>State v. Clark</u>, 452 S.W.3d 268, 287 (Tenn. 2014). However, if a trial court substantially complies with the rule's requirements, the court's ruling will not be overturned absent an abuse of discretion. <u>Id.</u> (citing <u>State v. Kiser</u>, 284 S.W.3d 227, 288-89 (Tenn. 2009); <u>State v. DuBose</u>, 953 S.W.2d 649, 652 (Tenn. 1997)). This court will find an abuse of discretion "only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." <u>State v. Banks</u>, 271 S.W.3d 90, 116 (Tenn. 2008) (citing <u>Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.</u>, 249 S.W.3d 346, 358 (Tenn. 2008)).

Berkley contends that we should conduct a de novo review of the trial court's ruling (1) because the trial court failed to state what admissible purpose the testimony was relevant to other than character; and (2) because the trial court failed to make an explicit finding on the record that the probative value was not outweighed by the danger of unfair prejudice. Because the trial court failed to make an explicit finding on the record that the probative value was not outweighed by the danger of unfair prejudice, we will review his decision to admit the evidence de novo. <u>Dubose</u>, 953 S.W.2d at 652-53 (reviewing admission of evidence de novo after trial court failed to balance probative and prejudicial value); <u>State v. Marcus Smartt</u>, No. M2014-01093-CCA-R3-CD, 2015 WL 3563024, at *8 (Tenn. Crim. App. June 9, 2015) (reviewing admission of evidence de novo after trial court failed to make explicit finding that evidence supporting prior bad acts was clear and convincing or balance probative and prejudicial value).

Upon our review, we conclude that the trial court did not err in allowing J.H. to testify that he reported the abuse to his mother after learning that a news report aired reporting Berkley's arrest. The evidence was admissible for the "other purpose" of offering contextual background information relevant to why J.H. decided to come forward approximately two years after the abuse occurred. Gilliland, 22 S.W. 3d. at 272. First, the challenged testimony was relevant to a material issue other than propensity, specifically the credibility of J.H., because it tended to explain why J.H. decided to come forward with these allegations over two years after they were alleged to have occurred. See State v. Rickey Bell, No. W2014-00049-CCA-R3-CD, 2015 WL 846745, at *13 (Tenn. Crim. App. Feb. 26, 2015), perm. app. denied (Tenn. June 15, 2015) (victim's testimony explaining why she did not report Defendant's sexual abuse earlier, "was highly probative on the issue of the victim's five-year delay in reporting the abuse . . . and also, by extension, on the victim's credibility."); Marcus Smartt, 2015 WL 3563024, at *8 (upholding trial court's admission of testimony of victim's mother regarding controlling behavior of the defendant because it was relevant to show why the victim did not disclose sexual abuse to her earlier).

Additionally, excluding evidence of the news report would likely have created a conceptual void in the jury's understanding of the State's case. J.H. testified that after the report of Berkley's arrest was on the news, his mother asked him if Berkley had "ever do[ne] anything to [J.H]," at which point J.H. told her about the abuse. Excluding the fact of the news report would have left the jury confused as to what prompted J.H.'s mother to ask her son if Berkley had abused him. The conceptual void created by excluding evidence of the news report would likely have resulted in significant jury confusion regarding J.H.'s testimony. See Rickey Bell, 2015 WL 846745, at *13 ("Had the victim been prohibited from explaining the reasons for her delay in reporting the abuse . . . this would likely have created a conceptual void in the State's case that likely would have resulted in significant jury confusion[.]"). Finally, the probative value of this evidence is not outweighed by the danger of unfair prejudice. The trial court properly restricted J.H. from testifying about the substance of the news reports, and instructed the jury on the purpose of this testimony was only to explain what prompted J.H. to report Berkley's abuse. Berkley is not entitled to relief on this issue.

## CONCLUSION

The judgments of the trial court are affirmed in all respects.

_____
CAMILLE R. McMULLEN, JUDGE